# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

DEIRDRE SEIM, individually, and on behalf
of all others similarly situated,

      Plaintiff,

vs.

HOMEAWAY, INC.,
a Delaware corporation,
and DOES 1-10,

      Defendants.

CASE NO. 1:16-cv-00479-LY

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION TO COMPEL
ARBITRATION AND DISMISS THIS
SUIT**

Plaintiff, Deirdre Seim, individually and on behalf of all others similarly situated, submits the following Response to Defendant HomeAway, Inc.'s, ("HomeAway") Motion to Compel Arbitration and Dismiss This Suit (ECF No. 15, "Motion to Compel").

## INTRODUCTION

Arbitration clauses in online user agreements are not magic. These clauses do not supersede black letter contract law, rewrite history, or cut short the Court's factual analysis merely through invocation by Defendant. Defendant HomeAway Inc.'s ("HomeAway") Motion to Compel blurs a very important factual issue about Ms. Seim's claims and the contract she purportedly signed. Specifically, HomeAway seeks to compel arbitration on multiple properties Ms. Seim owns, each with their own separate and distinct contract that includes terms for resolving disputes that arise under those contracts. But HomeAway seeks to do so using a separate contract formed with no consideration months after HomeAway allegedly breached the original contracts.

Not only was HomeAway's arbitration clause forced into its Terms and Conditions too late to apply to Ms. Seim's claims, but it is also invalid as a matter of law for three separate reasons. First, there is no consideration. *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002).  Second, intertwined with the lack of actual consideration, the Terms and Conditions that contain the arbitration clause are not a valid contract and is instead an illusory document. *Sara v. St. Joseph Healthcare Sys.*, 480 S.W.3d 286, 290 (Ky. Ct. App. 2015); *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202 (5th Cir. 2012). Third, the arbitration clause is procedurally and substantively unconscionable.  *Schnuerle v. Insight Communs., Co. L.P.*, 376 S.W.3d 561, 575 (Ky. 2012).  The judicial economy and public policy underlying the Federal Arbitration Act are served here by denying Defendant's Motion to Compel: there are multiple class action cases pending against HomeAway for the same exact breaches of contract Ms. Seim alleges, and those cases include Plaintiffs with no properties subject to the post-breach of contract arbitration clauses HomeAway is attempting to force onto plaintiff here.  Thus, forcing Ms. Seim's case to arbitration would result in split litigation in different fora and in violation of the forum selection provision HomeAway originally wrote into its Terms and Conditions.

For these reasons, Ms. Seim respectfully requests that this Court deny Defendant's Motion to Compel and allow her to proceed in HomeAway's chosen forum, the United States District Court for the Western District of Texas.

## FACTUAL BACKGROUND AND LEGAL STANDARDS APPLICABLE TO ONLINE TERMS OF USE AGREEMENTS AND ARBITRATION CLAUSES

The factual background required for the Court to determine whether Ms. Seim agreed to an arbitration clause that covers all of her claims against HomeAway is somewhat confusing and encompasses both the difficulty of applying traditional contract law to the varied and ever-changing world of online user agreements, and evaluation of multiple unilateral changes by

2

HomeAway to its user agreements and the conflicting provisions in all of the contracts applicable to Ms. Seim's various properties.   However, there is no dispute that HomeAway's arbitration clause was added *after* all of the events giving rise to this case and was only added to the contract governing *one* of her properties.

### 1.  Ms. Seim's Claims

HomeAway operates several websites that operate as vacation rental marketplaces, allowing homeowners and property managers (hereinafter "owners") to offer short-term vacation rental properties to travelers. Complaint ("Compl.") ¶ 4. Travelers can search HomeAway's websites, locate a vacation property to rent, communicate with the owner of that vacation property, and rent the vacation property without paying any additional fees to HomeAway. *Id.* ¶ 6. As a vacation rental marketplace, owners paid the costs of listing and renting their vacation properties, while travelers were only required to pay to the owner the cost of renting the vacation property itself. *Id.* ¶ 7. Owners were responsible for payment to HomeAway for use of HomeAway's websites. *Id.* ¶ 5. HomeAway represented to owners that its websites would continue to remain free for travelers, and contractually obligated itself to do so, distinguishing itself from other online rental websites. *Id.* ¶ 9. In reliance on this marketplace model and its representations, Ms. Seim and thousands of other homeowners entered into one- year contracts with HomeAway for the right to list their rental vacation properties on Defendant's websites. *Id.* ¶ 10. Ms. Seim and other property owners paid HomeAway annual subscription fees, often thousands of dollars per property. *Id.*

HomeAway offered multiple subscription options to Ms. Seim and other owners, such as "classic, bronze, silver, gold and platinum." *Id.* ¶ 25. HomeAway advertised that more expensive subscriptions provide owners with greater advertising benefits. *Id.* ¶ 26. The most significant

benefit that owners receive for purchasing a more expensive subscription is a higher ranking in search results when travelers search HomeAway's websites for rental properties. *Id.* Thus, more expensive subscriptions buy the owner visibility when travelers search for rental properties. *Id.*

Ms. Seim has used HomeAway's websites to list her vacation rental properties since 2011. *Id.* ¶ 17. Currently, she has five listings through HomeAway's website VRBO.com. *Id.* Her Complaint specifically refers to property number 653474, a gold level subscription and global bundle purchased on or about November 28, 2015 resulting in a total cost of $1,448.00. *Id.* ¶ 38. The Terms and Conditions governing her claims for all five properties was last changed and had an effective date of September 15, 2015. *Id.* ¶ 17; Deft's Motion to Dismiss, p. 2, ("September 15th Terms and Conditions," ECF 1-1). The September 15th Terms and Conditions include a provision that any non-clerical or substantive changes would be effective only if approved by Ms. Seim:

> We reserve the right, in our sole discretion, to amend these Terms, in whole or in part, at any time, with or without your consent and you acknowledge and agree that your consent to any such amendment is not required in the event that the proposed amendment is clerical and/or non-substantive in nature. Notification of any amendment will be posted on the Site by the indication of the last amendment date at the top of these Terms, and will be effective immediately. <u>If you disagree with any non-clerical and/or substantive amendment to these Terms</u>, then (i) your sole remedy as a traveler, or any other user other than a member, is to discontinue your use of the Site, and (ii) <u>your sole remedy as a member is to withhold your consent to the applicability of the proposed amendment to your use of the Site, in which case your use of the Site will continue to be governed by the terms and conditions that were applicable to your use of the Site during the then current term of your subscription</u> as the same were in effect immediately prior to the proposed amendment you agree that you are responsible for keeping a copy of such terms.

Compl. ¶ 40 (emphasis added).

On February 9, 2016, HomeAway unilaterally, and without notice, abandoned and materially changed this contract, ending its marketplace model and adopting an entirely different model and rate structure in the middle of the contractual period. *Id.* ¶ 13. HomeAway's new model was a materially different online travel agency model, whereby HomeAway began to charge additional fees to travelers for the use of HomeAway's websites, giving these additional fees the generic label, "service fees." *Id.* ¶ 14. The "service fees" instituted as part of HomeAway's material change range from four percent to ten percent of the total price of the owner's vacation property, thereby significantly increasing the total cost of the rental property to travelers. *Id.* ¶ 15. Ms. Seim was never informed of, nor consented to, these material changes to the contract. *Id.* ¶¶ 41-42.

Around this time, HomeAway also began encouraging owners to use Defendant's "pay-per-booking" option through its websites instead of signing up for different packages. *Id.* ¶ 94. Instead of charging travelers a percentage of the total cost of the rental, HomeAway through "pay-per-booking" charged owners a flat commission equal to eight percent of the booking cost, regardless of the price of the rental property. *Id.* The subscription on one of Ms. Seim's properties expired March 13, 2016. Instead of renewing her subscription, she switched this to a pay-per-booking package. The "pay-per-booking" model did not require any upfront payment by Ms. Seim. *See* Motion to Compel at Exhibit 1, ¶ 4, ECF 16. Thus, she did not provide any consideration when she signed up for this model. After she signed up for "pay-per-booking" for one of her five properties, the other four continued operating under the gold, silver and platinum levels and continue to do so. *Id.* at Exhibit 1A. Thus, the user agreement Ms. Seim signed on March 17, 2016 for one property did not change the terms of her other four contracts in any way, and the Terms and Conditions conflict with the Terms and Conditions of her recently-expired subscription.

Namely, the September 15th Terms and Conditions did not contain an arbitration clause; rather, it required users to bring claims "in the state or federal courts in Travis County, Texas which you acknowledge, consent to and agree will be the exclusive forum and venue for any legal dispute between you and us." *See* ECF 1-1, ¶ 18.  On April 15, 2016, Ms. Seim brought this action on behalf of herself and others similarly situated in federal court in Travis County, Texas, specifically, the United States District Court for the Western District of Texas, for HomeAway's unilateral decision to charge service fees in violation of both the express contract and the common law duty of good faith and fair dealing under that contract, as well as violations of state consumer protections statute and fraud.  *See* Compl. pp. 15-34.

## 2.   Legal Standards Applicable to Motions to Compel Arbitration

The first step in evaluating a motion to compel arbitration is to determine whether the parties have actually agreed to arbitrate the issues before the Court. This determination depends on two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement. *Fleetwood Enters. Inc., v. Gaskamp*, 280 F.3d 1069 (5th Cir. 2002). "There is no presumption regarding step one (*i.e.* a presumption that parties entered into an agreement to arbitrate.); step one is 'evaluated on the basis of ordinary state-law principles that govern the formation of contracts.'" *TRC Envtl. Corp. v. LVI Facility Servs.*, 612 Fed. Appx. 759, 761 (5th Cir. 2015) (*citing Fleetwood Enters, Inc.,* 280 F.3d at 1073); *see also W. Dairy Transp., LLC v. Vasquez,* 457 S.W.3d 458, 463 (Tex. App. 2014); *see also Volt Info. Scis. v. Bd. of Trs.,* 489 U.S. 468, 478 (1989) *("...the FAA does not require parties to arbitrate when they have not agreed to do so...")*.  As the Fifth Circuit held, any liberal federal policy in favor of arbitration does not apply to the first step in the analysis: whether "a valid arbitration agreement exists at all." *TRC Envtl. Corp* 612 Fed. Appx. at 762.

Because HomeAway is seeking to enforce Terms and Conditions with a Kentucky choice of law provision[1], this Court must look to Kentucky law as to the validity of that agreement. Kentucky law is clear that the court determines the validity of an agreement to arbitrate under ordinary state law contract principles.  As the Kentucky Supreme Court stated in *Kindred Nursing Ctrs. Ltd. P'ship v. Cox*, 486 S.W.3d 892, 894 (Ky. Ct. App. 2015):

> The enforcement and effect of an arbitration agreement is governed by the Kentucky Uniform Arbitration Act (KUAA), KRS 417.045 *et seq.*, and the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 *et seq.* 'Both Acts evince a legislative policy favoring arbitration agreements, or at least shielding them from disfavor.' But under both Acts, a party seeking to compel arbitration has the initial burden of establishing the existence of a valid agreement to arbitrate. That question is controlled by state law rules of contract formation. (Citations omitted.)

While Kentucky law favors arbitration, "the existence of a valid arbitration agreement as a threshold matter must first be resolved by the court." *Mortg. Elec. Registration Sys v. Abner,* 260 S.W.3d 351 (Ky. App. 2008). "In other words, the court - not an arbitrator - must decide whether the parties have agreed to arbitrate based on fundamental principles governing contract law." *Id.; see also Louisville Peterbilt, Inc. v. Cox,* 132 S.W.3d 850 (Ky. 2004). Although arbitration is favored in the law, the burden is upon the party seeking arbitration to establish whether a valid arbitration agreement exists. *GGNSC Stanford, LLC v. Rowe*, 388 S.W.3d 117, 121 (Ky.App.2012).

The Texas Supreme Court echoed the same standard in *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223 (Tex. 2003):

> Although we have repeatedly expressed a strong presumption favoring arbitration, the presumption arises only <u>after</u> the party seeking to compel arbitration proves that a valid arbitration

---

[1] In the 2-9-16 Terms and Conditions, Defendant revised the choice of law provision to apply Kentucky law. *See* ECF 16, Exhibit 2A, p. 25.

> agreement exists. . . . Arbitration agreements are interpreted under traditional contract principles. [W]hen deciding whether the parties agreed to arbitrate, 'courts generally . . . should apply ordinary state-law principles that govern the formation of contracts'. (Citations omitted.) (Emphasis added.)

*Id.* at 227-28. *See also In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 606 (Tex. 2005) ("Under the FAA, an agreement to arbitrate is valid if it meets the requirements of the general contract law of the applicable state.") (*citing First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

Questions concerning the formation of an arbitration agreement are resolved in accordance with the applicable state law governing contract formation. See *Extendicare Homes, Inc. v. Whisman,* 478 S.W.3d 306, 320 (Ky. 2015). ("The fundamental principle of contract formation is that to create a valid, enforceable contract, there must be a voluntary, complete assent by the parties having capacity to contract.") *Id.* at 321; *see also Dixon v. Daymar Colls. Grp., LLC,* No. 2012-SC-000687-DG, 2015 Ky. LEXIS 73, at *20 (Apr. 2, 2015) (attached as Exhibit 1) ("There exist legitimate questions regarding the valid formation of the Agreement. So the trial court was the proper forum for these proceedings.") A court must determine whether there exists a "valid, binding arbitration agreement" before it may order a case to arbitration. *Id.* at *17.

Where there is a question as to whether an arbitration clause exists at all as a meeting of the minds, courts must examine the facts and circumstances surrounding the creation of the agreement. *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335 (Ky. Ct. App. 2001). Courts must assess such claims on a case-by-case basis to determine if inclusion of the arbitration clause in the parties' agreement was abusive, unfair, or perhaps even involuntary and unknowing. *Conseco, supra. See also Paul Miller Ford, Inc. v. Rutherford*, No. 2007-CA-000293-MR, 2007 Ky. App. LEXIS 494, at *9-10 (Ct. App. Dec. 28, 2007) (attached as Exhibit 2).

**3.   Courts Analyze Online Agreements On A Factual Continuum Of User Assent**

The Hon. Jed S. Rakoff, United States District Court for the Southern District of New York, recently summarized the current state of online arbitration agreements recently in his Opinion and Order denying a motion to compel arbitration by Uber:

> Since the late eighteenth century, the Constitution of the United States and the constitutions or laws of the several states have guaranteed U.S. citizens the right to a jury trial. This most precious and fundamental right can be waived only if the waiver is knowing and voluntary, with the courts 'indulg[ing] every reasonable presumption against waiver.' *Aetna Ins. Co. v. Kennedy to Use of Bogash*, 301 U.S. 389, 393 (1937); *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc*., 500 F.3d 171, 188 (2d Cir. 2007). But in the world of the Internet, ordinary consumers are deemed to have regularly waived this right, and, indeed, to have given up their access to the courts altogether, because they supposedly agreed to lengthy 'terms and conditions' that they had no realistic power to negotiate or contest and often were not even aware of.

*Meyer v. Kalanick,* 2016 U.S. Dist. LEXIS 99921, at *1-2 (S.D.N.Y. July 29, 2016) (attached as Exhibit 3).[2]  Judge Rakoff noted that while *AT&T Mobility LLC v. Concepcion* stands for the proposition that "[t]his legal fiction is sometimes justified, at least where mandatory arbitration is concerned, by reference to the 'liberal federal policy favoring arbitration,'…[a]pplication of this policy to the Internet is said to inhere in the Federal Arbitration Act, as if the Congress that enacted that Act in 1925 remotely contemplated the vicissitudes of the World Wide Web." *Id.* at *2.

Courts applying longstanding state common law principles to online user agreements have analyzed the precise mechanics of not only how a user signs up to a website and manifests assent to the user agreement, but have also focused on exactly how the party seeking enforcement of an online agreement displayed both the method of assent and the actual terms themselves to the user.

---

[2] Uber has filed an Interlocutory Appeal of this Order to the Second Circuit.  However, Judge Rakoff's discussion and analysis of internet agreements is well-reasoned and persuasive on a number of issues, and collects the current state of the law involving online user agreements.

There are multiple ways in which consumers agree to online contracts, but they are generally sorted into one of four main categories: "clickwrap", "browsewrap", "scrollwrap" and "sign-in wrap" agreements.  *See Berkson v. Gogo, LLC,* 97 F. Supp. 3d 359, 394-95 (E.D.N.Y. Apr. 9, 2015). Only two of those are at issue here: "clickwrap" and "sign-in wrap" agreements.

### a.  "Clickwrap" Agreements

HomeAway asserts that the user agreement here is a "clickwrap" agreement because Ms. Seim affirmatively agreed to the Terms and Conditions by clicking a box next to a statement that read "I accept the Terms and Conditions and Privacy Policy", and that because the Terms and Conditions and Privacy Policy were each blue, it was clear they were hyperlinks that would take Ms. Seim to the full text of those agreements if she clicked on them.  *See* Motion to Compel at Agbodan Decl.  "Courts, in general, find them enforceable." *Gogo* 97 F.Supp. 3d at 397 (citations omitted).

### b.  "Sign-in wrap" Agreements

Instead of a "clickwrap" agreement, where the user must actually check the box indicating he or she agrees to the Terms and Conditions, a "sign-in wrap" instead "couples assent to the terms of a website with signing up for use of the site's services." *Id.* at 395.  That is, the website will include a statement that, by signing up or signing into the site, the user agrees to the Terms and Conditions or user agreement.  "Sign-in wrap" agreements are generally only upheld under certain circumstances, all of which require a detailed factual look at the user's experience and the conspicuousness of the link to the user agreement.  *Id.* at 400-01.

### c.  Analyzing Clarity and Conspicuousness To Determine Assent

However, as Judge Rakoff noted, "all of these labels can take courts only so far.  The issue of whether plaintiff Meyer agreed to arbitrate his claims 'turns more on customary and established

principles of contract law than on newly-minted terms of classification.'" *Meyer,* 2016 U.S. Dist. LEXIS 99921 at *21 (citations omitted). "One of these principles is that 'mutual manifestation of assent…is the touchstone of contract.' Moreover, '[a]rbitration agreements are no exception to the requirement of manifestation of assent,' and '[c]larity and conspicuousness of arbitration terms are important in securing informed assent.'" *Id.* (citations omitted). Judge Rakoff followed the standard set out by now-Supreme Court Justice Sonia Sotomayor, then writing for the Second Circuit in *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002). That standard is "whether plaintiff Meyer had '[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms." *Meyer*, 2016 U.S. Dist. LEXIS 99921, at *21, (*citing Specht,* 306 F.3d at 35).

Judge Rakoff then went on to analyze decisions from numerous circuits involving varying fact patterns to compare how the links to the Terms and Conditions were displayed to users (i.e., the location of the link on the screen, the size of the text relative to other information on the screen, the relative importance of the other information on the screen, etc.) and how various courts had determined whether the link was so conspicuous as to put the user on inquiry notice. *See Meyer* at *19-26. The court concluded: "As this brief review suggests, electronic agreements fall along a spectrum in the degree to which they provide notice, and it is difficult to draw bright-line rules because each user interface differs from others in distinctive ways." *Id.* at *30. "Consequently, courts must embark on a 'fact-intensive inquiry,' (*citing Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034-35 (7th Cir. 2016)), in order to make determinations about the existence of '[r]easonably conspicuous notice' in any given case." (*citing Specht* at 35).

Next, Judge Rakoff analyzed what happened if a user actually clicked on the Terms and Conditions. "Once users reached the 'Terms of Service' (i.e., the User Agreement), they had to

scroll down several pages in order to come across the arbitration provision, located in a 'dispute resolution' section." *Id.* at *33 (citations omitted).  The court noted that while there was bolded language in the arbitration section, there was no "prominent warning about the existence of an arbitration clause" at the beginning or in a more prominent place in the document.  *Id.* at *34. While "'a party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing'…the placement of the arbitration clause in Uber's User Agreement constituted, as a practical matter, a further barrier to reasonable notice.'"  *Id.* (citations omitted).

While not binding, this decision summarizes the current analysis applied to online user agreements and shows that the intensive factual inquiry courts make to determine whether the user actually agreed to arbitrate goes beyond determining if the Terms and Conditions simply contain an arbitration clause and ending the inquiry there.

**4.  <u>HomeAway Has Not Carried Its Burden To Show Ms. Seim Actually Agreed to Terms and Conditions Using "Click-Wrap" Agreement</u>**

Ms. Seim disputes that there is a valid arbitration agreement here.  HomeAway bears the burden of showing that she agreed to one, and seeks to do so with an affidavit purporting to show that Ms. Seim had to agree to the Terms and Conditions through a "clickwrap" agreement.  *See* Motion to Compel at Agbodan Decl., Exhibit B.  However, these are screenshots from an internal HomeAway computer on a "test account in our production environment," and not the actual page Ms. Seim saw when she accessed her account.  *Id.* at p. 12.  There is not sufficient evidence to show that this was the actual process Ms. Seim went through on March 17, 2016, when she signed up for the pay-per-booking listing.  *See also Briones v. Fitness Int'l, LLC*, No. SACV 16-44-JLS, Slip Op. at 6 (C.D. Cal. Aug. 5, 2016) (attached as Exhibit 4) (holding defendant's declaration regarding its "general practice of reviewing agreement terms with a member before obtaining the member's signature" failed to meet defendant's burden of demonstrating an agreement to arbitrate

existed, where arbitration clause was contained in plaintiff's agreement with fitness club).   In fact, HomeAway appears to have changed their process to a "sign-in wrap" *before* the date Ms. Seim entered into a new contract on one of her properties, and therefore Ms. Seim's alleged "consent" should be viewed with greater scrutiny by the Court.   According to the Internet Archive (also known as the "Wayback Machine"), HomeAway has used a "sign-in wrap" process since at least March 14, 2016 - three days *before* Ms. Seim purportedly agreed to the arbitration clause:

As depicted below, the Internet Archive creates screenshots of webpages at various points in time, and organizes them by a calendar view:



(https://web.archive.org/web/*/https://www.vrbo.com/info/list-your-property, accessed August 7, 2016).

If someone wants to list a property on VRBO, the HomeAway site at issue in this case, the user goes to the "List Your Property" page and sees this "sign-on wrap" as of August 7, 2016:



([https://www.vrbo.com/info/list-your-property](https://www.vrbo.com/info/list-your-property), accessed August 7, 2016).

The "sign-on wrap" first appeared no later than March 14, 2016:



(https://web.archive.org/web/20160314083129/https://www.vrbo.com/info/list-your-property;

accessed August 7, 2016).

HomeAway made this change at most a few days earlier, because the most recent archived

view before March 14, 2016, was March 9, 2016, which contained the "clickwrap" agreement:



(https://web.archive.org/web/20160309062833/https://www.vrbo.com/info/list-your-property; accessed August 7, 2016).

Thus, three days before HomeAway claims Ms. Seim agreed via "clickwrap", HomeAway actually switched to a "sign-in wrap" format.  HomeAway did not submit the *actual* screen Ms. Seim saw, but only an internal "test account in our production environment."  At a minimum, there is enough evidence to justify discovery by Plaintiff as to whether she actually was subject to a "clickwrap" or "sign-in wrap" to assist in determining where on the continuum her alleged assent falls.  Without actual proof of what Ms. Seim actually did on March 17, 2016, HomeAway has not met its burden that there is a valid agreement here.

**5.**  **The Conspicuousness Of HomeAway's User Agreement and Arbitration Clause**

Assuming Ms. Seim did sign up for a pay-for-booking product on March 17, 2016, using a "clickwrap" agreement, the inquiry does not end there.  This Court must then analyze whether the actual layout and presentation of this checkbox and links to the user agreement was sufficiently conspicuous to put Ms. Seim on inquiry notice of the arbitration clause.  This screenshot from HomeAway's Motion to Compel purports to show what Ms. Seim saw when clicking "yes" to accept the terms of use:



Agbodan Decl. Exhibit B                              Page 3

Similar to the agreements in *Meyer* that Judge Rakoff found insufficient to create valid,

binding contracts, here the hyperlink is small, at the very bottom of the screen, not directly next to

the "NEXT" button, and on a screen with much more important information, such as the user's address and credit card number.

Finally, there is no conspicuous warning in the user agreement that it contains an arbitration clause, and despite the large print included in HomeAway's exhibit, the website version is actually more difficult to read with smaller type:



([https://web.archive.org/web/20160309145739/https://www.vrbo.com/info/termsandconditions](https://web.archive.org/web/20160309145739/https://www.vrbo.com/info/termsandconditions)

accessed August 7, 2016). The agreement spans 38 pages when printed out and the arbitration provision is not mentioned until page 20, more than halfway through. And, as discussed in more detail below, it does not clearly explain to any user who happened to get that far in the document that it would change the terms and conditions applicable to *other* contracts then in effect, such as

for different packages on different properties, and therefore does not adequately explain the rights HomeAway is asking the user to waive.

> 6.  **The Various and Conflicting Contractual Terms Applicable to Ms. Seim's Properties**

>> a.  **The September 15th Terms and Conditions**

Ms. Seim purchased platinum, gold and silver subscriptions on her five properties on VRBO on or before November 2015, and when HomeAway violated its obligations and made the service fees change at issue in this case, the September 15th Terms and Conditions were in effect. *See* Compl. ¶¶73-79.  Specifically, HomeAway's introduction of fees charged to users violates Section 21: "For subscription listings, the rates in effect at the time of the member's next subscription renewal, new listing or a member's upgrade or any other additional or new order of any product or service will govern for such renewal or other order."  Compl. ¶¶ 76-78.  At the time she signed up for her subscriptions, she paid HomeAway a significant amount of money upfront: she spent $1,448 to list just one of her five properties for 12 months.  *Id.* ¶10.

The September 15th Terms and Conditions included a provision in Section 18, in bold faced, all-capital letters type, requiring that:

> ANY CAUSE OF ACTION YOU MAY SUBMIT IN CONNECTION WITH YOUR USE OF THE SITE *OR PURSUANT TO THESE TERMS* WILL BE FILED IN THE STATE OR FEDERAL COURTS IN TRAVIS COUNTY, TEXAS WHICH YOU ACKNOWLEDGE, CONSENT TO AND AGREE WILL BE THE EXCLUSIVE FORUM AND VENUE FOR ANY LEGAL DISPUTE BETWEEN YOU AND US. YOU ALSO AGREE THAT ANY DISPUTE BETWEEN YOU AND US WILL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.
>
> *ANY CAUSE OF ACTION YOU MAY HAVE HEREUNDER* OR WITH RESPECT TO YOUR USE OF THE SITE MUST BE COMMENCED BY FILING SUIT IN TRAVIS COUNTY, TEXAS, WITHIN ONE (1) YEAR AFTER THE INCIDENT UPON WHICH THE CLAIM OR CAUSE OF ACTION IS BASED FIRST OCCURRED.

*See* ECF 1-1, ¶ 18 (emphasis added).

The September 15th Terms and Conditions included a provision in Section 21 that HomeAway and VRBO "reserve the right, in our sole discretion, to amend these Terms, in whole or in part, at any time, with or without your consent and you acknowledge and agree that your consent to any such amendment is not required in the event the proposed amendment is clerical and/or non-substantive in nature."   ECF 1-1, ¶ 21.   However, if Ms. Seim were to "disagree with any non-clerical and/or substantive amendment to these Terms…[her] sole remedy as a member is to withhold your consent to the applicability of the proposed amendment to your use of the Site, in which case your use of the Site will continue to be governed by the terms and conditions that were applicable to your use of the Site during the then current term of your subscription as the same were in effect immediately prior to the proposed amendment and you agree that you are responsible for keeping a copy of such terms."   *Id.*   Put simply, HomeAway could change the terms at any time, but if Ms. Seim did not agree, the changes would not go into effect.

To be clear, Ms. Seim did not and does not agree to the changes HomeAway purports to make to the September 15th Terms and Conditions specifically as it relates to the Arbitration clause changing Section 18 and the service fees as alleged in her Complaint.

### b.  The February 9th Terms and Conditions

When one of her subscription packages expired on March 13, 2016, Ms. Seim switched that property to the pay-per-booking package, which she signed up for on March 17, 2016.   But on February 9, 2016, HomeAway had "unilaterally abandoned and materially changed the contract, abandoning its marketplace model and adopting an entirely different model and rate structure in the middle of the contractual period."   Compl. ¶13.   The February 9th Terms and Conditions deleted Section 18, above, and inserted a new arbitration provision, Section 19.   Section 19 included the following language:

21

> **Any and all Claims will be resolved by binding arbitration, rather than in court**, except you may assert Claims on an individual basis in small claims court if they qualify. This includes any Claims you assert against us, our subsidiaries, users or any companies offering products or services through us (which are beneficiaries of this arbitration agreement). This also includes any Claims that arose before you accepted these Terms, regardless of whether prior versions of the Terms required arbitration.

*See* Motion to Compel at Exhibit 2A, p. 20 (emphasis in original).  Section 19 defined "Claims" extremely broadly: "You agree to give us an opportunity to resolve any disputes or claims relating in any way to the Site, any dealings with our customer experience agents, any services or products provided, any representations made by us, or our Privacy Policy ('Claims')."  However, Section 19 did not explain to Ms. Seim that HomeAway would assert that this Arbitration Agreement was so broad as to change the terms of four other, separate contracts she had previously entered into for four other properties, and would retroactively change the terms of the Terms and Conditions on her subscription that just expired which required disputes arising from that contract to be brought in Travis County, Texas.

That is because signing up for a new package on March 17, 2016 on one property did not really change terms on her four other properties, or eliminate her rights and obligations under the just-ended subscription: Ms. Seim's other properties continued to be listed according to the terms of the subscription agreement she paid for on each property and did not change to fee-for-booking just because she changed one property to fee-for-booking, nor did HomeAway return to her, *pro rata*, her fully paid in advance annual subscription fees.  HomeAway is thus seeking to change material terms of five separate contracts with a section buried more than halfway through a 40-page Terms and Conditions filled with language the reasonable non-lawyer would have trouble understanding.

Finally, in the February 9th Terms and Conditions, HomeAway and VRBO purported to:

> reserve the right, in our sole discretion, to amend these Terms, in whole or in part, at any time, with or without your consent and you acknowledge and agree that your consent to any such amendment is not required in the event the proposed amendment is clerical and/or non-substantive in nature . . . your sole remedy as a member is to withhold your consent to the applicability of the proposed amendment to your use of the Site, in which case your use of the Site will continue to be governed by the terms and conditions that were applicable to your use of the Site during the then current term of your subscription as the same were in effect immediately prior to the proposed amendment and you agree that you are responsible for keeping a copy of such terms.

*See* Motion to Compel at Exhibit 2A, p. 26.

In sum, HomeAway bears the burden to show that the February 9th Terms and Conditions created a valid and enforceable contract that altered the terms of five separate contracts, despite Ms. Seim exercising her right under *all* contracts to assert that she does not agree to the changes to Section 18 of the September 15th Terms and Conditions. Controlling law from Texas, Kentucky and the Fifth Circuit show that HomeAway cannot do so, and persuasive opinions from Federal District Courts and Circuit Courts of Appeals from across the country further support Ms. Seim's position. This Court must deny HomeAway's Motion to Compel.

## DISCUSSION

### A.   The February 9th Terms and Conditions Are Not A Valid Agreement To Arbitrate

#### 1.   There Was No Consideration For the February 9th Terms and Conditions

To constitute a valid contract, there must be an offer and acceptance, full and complete terms, and a mutual, bargained-for exchange of valuable consideration. See *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002). In *Sara v. St. Joseph Healthcare Sys.*, 480 S.W.3d 286, 290 (Ky. Ct. App. 2015), the Kentucky Court of Appeals rejected the argument that a hospital's bylaws created a binding contract with one of its employees, because the hospital had a duty to adopt such bylaws and retained authority to unilaterally amend them.

23

Therefore, there was no "consideration" exchanged: "But generally, a promise to perform something that the promisor was already bound to do cannot constitute new and valuable consideration necessary to form a contract. [Therefore] the alleged contract lacked both mutuality of obligation and valuable consideration." *Id.* at 291 (*citing Wallace v. Cook*, 227 S.W. 279, 281 (Ky. 1921)).

Here, there was no consideration for the February 9th Terms and Conditions because the pay-per-booking package did not require Ms. Seim to pay any money up front or do anything whatsoever.  HomeAway cannot dispute this fact, as its own employee submitted an affidavit to this effect: "With pay-per-booking, members pay only for the bookings received instead of paying an upfront fee for a subscription."  Motion to Compel, Exhibit 1 at ¶ 4.  All Ms. Seim did was choose "pay-per-booking" option for a property that had already been listed on HomeAway for years: she did not provide any consideration and the offer specifically said Ms. Seim was paying "$0 upfront" and would be "paying nothing until [she] got results":



*See* Motion to Compel, Ex. 1B at p. 2.  Even if Ms. Seim later paid HomeAway a fee for someone booking this property, that would not act as consideration for the February 9th Terms and Conditions as Kentucky law is clear that "it is a general rule that past consideration is insufficient to support a promise."  *Sawyer v. Mills,* 295 S.W.3d 79, 86 (Ky. 2009) (*citing 17A Am. Jur. 2d Contracts § 152* (2009)).   Thus, under black letter contract law, the February 9th Terms and Conditions are not a valid contract as there was no consideration for the arbitration agreement when Ms. Seim signed up for pay-per-booking on March 17, 2016.

### 2. If HomeAway Will Not Let Ms. Seim Reject Changes, Then The February 9th Terms and Conditions Is An Illusory Contract

Beyond monetary consideration, there is no valid agreement to arbitrate this dispute because the agreement is illusory.  HomeAway reserved to itself alone the right to amend the Terms and Conditions, so there was no exchange of consideration. As the Kentucky court noted in *Sara*, 480 S.W.3d at 291, there was no contract between the hospital and the employee by virtue of the hospital's adoption of bylaws because ". . . the Hospital drafted its Bylaws without input from the medical staff, and it retained the authority to modify those Bylaws without additional consultation."  "Every contract requires mutual assent and consideration." *Cuppy v. General Accident Fire & Life Assurance Corp.*, 378 S.W.2d 629, 632 (Ky. 1964). "Mutuality of obligation is essential to the validity of an executory contract, and if either party is not bound because of lack of mutuality neither is bound." *Fowler's Bootery v. Selby Shoe C*o., 273 Ky. 670, 671-72, 117 S.W.2d 931, 932 (1938).  "The crucial question is whether the nature of the unilateral option is such that the party to whom it is granted has in actuality no fixed obligations under the contract. If so, his promise to perform is illusory in the sense that he has made no legally enforceable commitment, and justice demands the other party should not be bound." *David Roth's Sons, Inc. v. Wright & Taylor, Inc.*, 343 S.W.2d 389, 391 (Ky. 1961).

The United States District Court for the Eastern District of Kentucky applied this longstanding black letter Kentucky contract law in the context of arbitration agreements as recently as 2012 in *Wallace v. Fortune Hi-Tech Marketing*. 2012 U.S. Dist LEXIS 136029 *4 (E.D. Ky. Sept. 24, 2012) (attached as Exhibit 5). There, a plaintiff brought claims against a defendants for consumer protection violations stemming from a pyramid scheme. *Id.* at *2. The defendants moved to compel arbitration. *Id.* The Court held that the defendants' promise to arbitrate was illusory because of a provision that, like the one here, authorized defendants to unilaterally amend the agreement. *Id.* at *4. Thus, the court held, the "amendment provision renders illusory the alleged agreement to arbitrate because FHTM has in actuality no fixed obligation to perform." *Id.* at *5. (*citing David Roth's Sons, Inc* at 391). The court denied the motion to compel arbitration because, like here, the defendants' "promise to perform is illusory in the sense that it has made no legally enforceable commitment, and justice so demands the other party should not be bound." *Id.* at *7.

The Sixth Circuit affirmed this decision (as well as a similar companion case) in the unpublished decision *Day v. Fortune Hi-Tech Mktg.*, 536 Fed. Appx. 600, 2013 U.S. App. LEXIS 19060 (6th Cir. 2013) (attached as Exhibit 6). The court was clear: "Because Defendant retained the ability to modify any term of the contract, at any time, its promises were illusory." *Id.* at 604 (*citing Fowler's Bootery v. Shelby Boot Co.,* 117 S.W.2d 931, 932-33 (Ky. 1938). Like here, "in effect, Defendant promised to do certain things unless it decided not to, and that is by definition illusory." *Id.*, (citations omitted). Just because the parties "performed" under the terms of the contract, as Ms. Seim did here by listing her pay-per-booking property on VRBO.com, the Sixth Circuit reasoned this did not change the illusory nature of the contract at formation. *Id.* at 605.

Under both the September 15th and February 9th Terms and Conditions, HomeAway reserved the right to change the terms unilaterally, but gave Ms. Seim the right to reject that change. Ms. Seim rejects the changes, and HomeAway cannot have it both ways: if it still seeks to force her into arbitration by arguing the terms have been changed over her objection, then the Terms and Conditions are purely illusory under Kentucky law. HomeAway's obligation to actually put Ms. Seim's properties on the website were illusory as well, as HomeAway reserved the right to "change, suspend, or discontinue any aspect of this site at any time, including the availability of Site features, database, or content. We may also…restrict your access to parts or the entire Site without notice or liability." *See* Motion to Compel, Exhibit 2A at pg. 26. Under Kentucky law, HomeAway's Terms and Conditions are illusory because HomeAway reserves the right to unilaterally change, ignore or otherwise not follow the contract at any time without notice or liability. "Nothing bound Defendant to perform. The fact that it continued to do so may be indicative of goodwill, or of its belief that it had an obligation, but the terms of the agreement itself were subject to modification at any point, and subsequent performance cannot excuse a want of consideration." *Day* at 605. (citations omitted).

Texas law is the same. *See Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202 (5th Cir. 2012); *see also Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1228 (N.D. Cal. 2015) (denying motion to compel arbitration and reasoning, *inter alia*, that "'the unilateral power to terminate or modify the contract is substantively unconscionable'") (quoting *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir.2003)).

In *Carey*, "a former sales representative for 24 Hour Fitness" received an employee handbook with an arbitration clause. *Id.* at 204-05. The handbook also included a provision allowing the employer to "revise, delete, and add to the employee handbook." *Id.* The trial court

denied the defendant's motion to compel arbitration, and the Fifth Circuit upheld that decision.  *Id.* at 204.  Despite the "liberal federal policy favoring arbitration," the Fifth Circuit noted that "federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties."  *Id.* at 205 (citations omitted).  Like Kentucky law as described in *Sara*, "[u]nder Texas law, an arbitration clause is illusory if one party can 'avoid its promise to arbitrate by amending the provision or terminating it altogether.'"  *Carey* at 205, *citing In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010).  "Put differently, where one party to an arbitration agreement seeks to invoke arbitration to settle a dispute, if the other party can suddenly change the terms of the agreement to avoid arbitration, then the agreement was illusory from the outset."  *Id.* at 205.

That is exactly what has happened here: the September 15th Terms and Conditions included a choice of venue provision that required claims to be brought in *this* Court, including language that specifically required claims arising from the contract to be litigated in court in Travis County, Texas.  *See* ECF 1-1, ¶ 18.  However, HomeAway is now trying to change that unilaterally by using a subsequent and unilaterally imposed Terms and Conditions to force arbitration of "any and all" claims in general and ignoring Ms. Seim's rejection of that material change.  Under both Kentucky and Texas law, this makes that agreement illusory and invalid, and this Court must therefore deny HomeAway's Motion.

### 3.  The February 9th Terms and Conditions Arbitration Agreement is Unconscionable

Under clear Kentucky law, if an agreement to arbitrate is procedurally or substantively unconscionable, it is unenforceable.  "The doctrine of unconscionability . . . is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences *per se*

of uneven bargaining power or even a simple old-fashioned bad bargain." *Schnuerle v. Insight Communs., Co. L.P.*, 376 S.W.3d 561, 575 (Ky. 2012)

The Supreme Court of Kentucky has also been clear that "[u]nder both the Federal Arbitration Act and the Kentucky Uniform Arbitration Act, agreements to submit controversies to arbitration may be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.'" *Energy Home v. Peay,* 406 S.W.3d 828, 835 (Ky. 2013) (*citing* 9 U.S.C. § 2; KRS 417.050). "Certainly, unconscionability is one of the grounds upon which any contract may be revoked." *Id.* (citations omitted). The Supreme Court of Kentucky explained the types of unconscionability under Kentucky law:

> Procedural unconscionability relates to the process by which an agreement is reached and to the form of the agreement. It includes, for example, the use of fine or inconspicuous print and convoluted or unclear language that may conceal or obscure a contractual term. Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent. When reviewing for substantive unconscionability, consideration is given to 'the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns.'

*Id.* at 835 (*citing Schnuerle*, 376 S.W.3d at 576-77).

In *Valued Servs. of Ky., LLC v. Watkins*, 309 S.W.3d 256, 263 (Ky. Ct. App. 2009), the Kentucky Court of Appeals noted that while an agreement to arbitrate is not unconscionable merely because the parties to it are unequal in bargaining position, "an arbitration clause that contains a substantial waiver of a parties' rights is unenforceable." *See also Mortg. Elec. Registration Sys. v. Abner*, 260 S.W.3d 351, 354 (Ky. Ct. App. 2008) ("a bargain is not unconscionable merely because the parties to it are unequal in bargaining position, [but] an arbitration clause that contains a substantial waiver of a parties rights' is unenforceable.") (citations and quotation marks omitted).

Under any reasonable viewing, HomeAway's February 9th Terms and Conditions are procedurally and substantively unconscionable.  First, as discussed above, whether it was a "clickwrap" or "sign-in wrap" agreement, the Terms and Conditions were as hidden as the Terms and Conditions or Terms of Use in those cases where arbitration agreements were invalidated in cases such as those Judge Rakoff highlighted in *Meyer*, *supra*. As in those cases, HomeAway did not provide "reasonably conspicuous notice"; instead, it merely included a link in very small typeface at the bottom of a page with much more important information such as credit card fields. *See Meyer,* 2016 U.S. Dist. LEXIS 99921, at *31 ("…it is hard to escape the inference that the creators of Uber's registration screen hoped that the eye would be drawn seamlessly to the credit card information and register buttons instead of being distracted by the formalities in the language below.").  Further, like the wording of the hyperlink in *Meyer*, the wording of HomeAway's "hyperlink adds to the relative obscurity of Uber's User Agreement.  The Court cannot simply assume that the reasonable (non-lawyer) smartphone user is aware of the likely contents of 'Terms of Service,' especially when that phrase is placed directly alongside 'Privacy Policy.'"  *Id.* at *31-32.  "The reasonable user might be forgiven for assuming that 'Terms of Service' refers to a description of the types of services that Uber intends to provide, not to the user's waiver of his constitutional right to a jury trial or his right to pursue legal redress in court should Uber violate the law."  *Id.* at *32.  The court cited *GoGo* for the proposition that "'the importance of the details of the contract was obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product.'"  *Id.* (*citing GoGo* , 97 F.Supp. 3d at 402).  This is the exact same standard for unconscionability in Kentucky: "the use of fine or inconspicuous print and convoluted or unclear language that may conceal or obscure a contractual term."  *Peay*, 406 S.W.3d at 835.

Here, Ms. Seim had used HomeAway since 2011, and had operated continuously under Terms and Conditions without arbitration clauses.  Because there was no conspicuous indication or notice by HomeAway that these February 9th Terms and Conditions were substantially different than previous versions, there was no reason for her or any reasonable person to suspect such drastic changes, nor did Ms. Seim have any opportunity to amend, alter, negotiate or otherwise bargain for these terms.  As discussed by Judge Rakoff, the crux of whether there is true inquiry notice is whether these is some conspicuous information, understandable by a reasonable, non-lawyer user as to the true gravity of the rights Ms. Seim was giving up.  Here, even if the Terms and Conditions link and presentation of the webpages are sufficient to put her on notice she should click on them, there is nothing she would see when she viewed the Terms and Conditions that indicated it was a drastically different contract than the dozens of previous ones she had entered into over the past five years, nor is there any indication until more than halfway through that the arbitration agreement is even part of it.

The February 9th Terms and Conditions are also substantively unconscionable. HomeAway is attempting to use an unrelated, free service to unilaterally and retroactively change only certain terms of multiple previous contracts on other properties, or eliminate Ms. Seim's ability to bring claims under the terms of five separate contracts, some of which were ongoing and one of which had expired, without clearly and understandably spelling that out to users.  The arbitration clause in Section 19 of the February 9th Terms and Conditions is unreasonably and unconscionably broad.  It purports to cover "any disputes or claims relating in any way to the Site, any dealings with our customer experience agents, any services or products provided, any representations made by us, or our Privacy Policy."  It also purports to apply to "any Claims that

arose before you accepted these Terms, regardless of whether prior versions of the Terms required arbitration." *Id.*

As Judge Posner pointed out in invalidating a similarly overbroad arbitration clause: "if there were no limiting clause in the arbitration agreement at issue in that case, 'absurd results [would] ensue,' such that if a defendant murdered the plaintiff in order to discourage default on a loan, the wrongful death claim would have to be arbitrated." *In re Jiffy Lube Int'l, Inc.*, 847 F.Supp. 2d 1253, 1263 (S.D. Cal. March 9, 2012), (*citing Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003)).  In *Jiffy Lube*, the Court determined, post-*Concepcion*, that a service agreement signed by the plaintiff at a Jiffy Lube that purported to cover "any and all disputes, controversies or claims between Jiffy Lube and you" through arbitration was so broad as to be invalid, and therefore did not cover allegations of TCPA violations. *Id.* at 1262-63.  The court held that this arbitration agreement was "incredibly broad" and refused the defendant's attempt to "urge the court to construe this agreement narrowly enough to avoid invalidation, but broadly enough to encompass the claims at issue in this case." *Id.*

That same reasoning applies here: HomeAway seeks to, after the fact, insert an arbitration clause that covers any and all disputes related to HomeAway's websites in any way, shape or form, including ones relating to ongoing contracts with different terms for dispute resolution, without clearly or unequivocally explaining those terms.  This is so broad as to be unenforceable, especially when it conflicts with HomeAway's previous choice of venue provision that it also wrote.  In addition to the arbitration agreement, in which HomeAway seeks to enforce a substantial waiver of Ms. Seim's rights to seek redress in court and receive a trial by jury as guaranteed by the 7th Amendment to the Constitution, the February 9th Terms and Conditions also includes an extensive

limitation of all liability clause in Section 16 that gives HomeAway complete immunity from all damages.

In analyzing substantive unconscionability under Kentucky law, this Court must give consideration to "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Peay* 406 S.W.3d at 835 (citations omitted).  Here, HomeAway made two material changes to the September 15th Terms and Conditions on the same day: it added service fees despite repeated public assurances to Ms. Seim and other property owners and its contractual agreements not to do so (Compl. at ¶¶ 9, 31, 33, 35, 36) and it sought to eliminate the right of Ms. Seim and other property owners to bring a case in court or receive a trial by jury over that change, despite having originally chosen Travis County, Texas, as the required venue for claims.  Taken together, it is clear that HomeAway took an action it knew would lead to lawsuits for breach of contract, and therefore unilaterally inserted language to shield itself from those lawsuits at the exact same time, without any notice or consideration to users about the change.  The "purpose and effect" of these actions is to allow HomeAway to take full payment upfront for a product and then simply not deliver it, with no consequences and judicial immunity.  Certainly no business would agree to such a term, and public policy should not allow the simultaneous breach of and unilateral change to the enforcement mechanism of a contract.  Under Kentucky law, the arbitration agreement is substantively unconscionable and cannot be enforced as a matter of public policy.

**B.** **The February 9th Terms and Conditions Do Not Apply To Claims Brought Pursuant To the September 15th Terms and Conditions**

HomeAway cannot change the express terms of the September 15th Terms and Conditions so as to force Ms. Seim into arbitration as opposed to federal court in Travis County, Texas, and, by its actions, did not change the subscription agreements governed by those terms for Ms. Seim's

properties after she switched a property to pay-per-booking on March 17, 2016.  Kentucky contract law is clear: "The fundamental principle of contract formation is that [t]o create a valid, enforceable contract, there must be a voluntary, complete assent by the parties having capacity to contract. This principle applies with no less vigor when the issue is formation of an arbitration contract." *Extendicare Homes, Inc. v. Whisman*, 478 S.W.3d 306, 321 (Ky. 2015).

Ms. Seim's subscription contracts were not amended by the February 9th Terms and Conditions because Ms. Seim did not agree to change the terms of those subscription plans and HomeAway did not change the booking process for her other four properties.  That is, when Ms. Seim signed up for fee-per-booking on March 17, 2016, for one of her properties, the other four properties continued on as subscription-based bookings pursuant to the September 15th Terms and Conditions.  Further, Ms. Seim retains the right to disagree to any purported attempt to change the September 15th Terms and Conditions under Section 21, and she demonstrated this lack of consent by filing suit in Federal Court in Travis County, Texas, pursuant to the September 15th Terms and Conditions.

It is black letter contract law that one party may not unilaterally modify a contract, and that mutual assent is required. 17A C.J.S. Contracts § 545 (2013). It is also a fundamental principle of contract law - and has been in Kentucky since 1877 - "that a material alteration in the terms of an existing contract cannot be enforced unless a consideration for the change passes to the party against whom it is sought to enforce the altered condition." *See Pool v. First Nat'l Bank*, 155 S.W.2d 4, 6 (Ky. 1941) (*citing Gilmore v. Green*, 14 Bush 772, 77 Ky. 772 (Ky, 1879); *Ogden v. Redd*, 76 Ky. 581 (Ky. 1877)).  That consideration for changing the terms of the September 15th Terms and Conditions through the February 9th Terms and Conditions is missing here.

34

More recently, in *Dixon v. Daymar Colls. Grp., LLC*, No. 2012-SC-000687-DG, 2015 Ky. LEXIS 73 (Apr. 2, 2015),[3] the Kentucky Supreme Court held that an arbitration clause printed on the back of a student enrollment form was not valid because the student was to sign only the front of the form and the attempt to incorporate the arbitration clause on the back of the form was unsuccessful.  Assent to be bound by the terms of an arbitration agreement must be clearly expressed.  There is no question that because HomeAway was required to provide specific and direct notice to Ms. Seim that the Terms and Conditions were being changed in order to successfully modify the September 15th Terms and Conditions: "While some states may permit enforcement of a contract that requires only notice, rather than advance notice, for alteration of its terms, Kentucky is not one of those states." *Day v. Fortune Hi-Tech Mktg.*, 536 F. Appx. 600, 604 (6th Cir. 2013).[4]

Here, HomeAway offered nothing to Ms. Seim in exchange for the material alterations to the September 15th Terms and Conditions, making those changes invalid.   Nor did HomeAway provide notice it had materially changed the Terms and Conditions - and was seeking to change the previous Terms and Conditions on her other properties - when Ms. Seim switched her property from subscription-based to pay-per-booking based on March 17, 2016.  As Ms. Seim brought claims pursuant to the September 15th Terms and Conditions for breach of that contract, and because that contract specifically required claims arising from it and claims in general to be filed in a Court in Travis County, Texas, HomeAway cannot now seek to compel arbitration with respect to those claims. Because the February 9th Terms and Conditions cannot and did not modify Ms.

---

[3] Attached as Exhibit 1
[4] Attached as Exhibit 6

Seim's subscriptions pursuant to the September 15th Terms and Conditions, there is no valid arbitration clause governing her claims under the September 15th Terms and Conditions.

> **C.**   **Judicial Economy And Public Policy Would Not Be Served By Enforcing Arbitration Clause Against Ms. Seim**

The public policy aims of the Federal Arbitration Act would not be furthered by forcing Ms. Seim's claims for one or any of her properties to arbitration here, because in addition to her four subscription properties without arbitration clauses, there are multiple other filed cases by individuals who are not subject to motions to compel arbitration in *Brickman v. HomeAway*, 2016-cv-733, also pending before this Court, which seek class action treatment over the same issues. Thus, regardless of the outcome here, additional claims involving the same underlying merits as Ms. Seim's case will proceed in this Court, including some of her claims. Judicial economy and public policy support managing all of these cases together in one proceeding.

Finally, even if the arbitration agreement may be found applicable to some of Ms. Seim's claims in this case, Plaintiff objects to Defendant's motion to dismiss the case, as the portion of the case subject to arbitration should be stayed instead. Section 3 of the Federal Arbitration Act "allows litigants already in federal court to invoke agreements made enforceable by § 2. That provision requires the court, 'on application of one of the parties,' to stay the action if it involves an 'issue referable to arbitration under an agreement in writing.'" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009); *see also Grasso Enters., LLC v. CVS Health Corp.*, 143 F. Supp. 3d 530, 542 (W.D. Tex. 2015) ("The Federal Arbitration Act provides that the Court shall stay the case pending resolution of the arbitration upon application of a party.").

## CONCLUSION

For these reasons, Plaintiff respectfully requests the Court deny defendant HomeAway's Motion to Compel Arbitration.

By: s/ Jasper D. Ward IV\_\_\_\_

JONES WARD PLC
Jasper D. Ward IV
Alex C. Davis
Marion E. Taylor Building
312 S. Fourth Street, Sixth Floor
Louisville, Kentucky 40202
Tel. (502) 882-6000
Fax (502) 587-2007
jasper@jonesward.com
alex@jonesward.com

Michael C. Singley
Texas Bar No. 00794642
THE SINGLEY LAW FIRM, PLLC
4131 Spicewood Springs Rd., Ste. O-3
Austin, Texas 78759
(512) 334-4302 phone
(512) 727-3365 fax
mike@singleylawfirm.com

Ketan U. Kharod
Texas Bar No. 24027105
KHAROD LAW FIRM, P.C.
P.O. Box 151677
Austin, TX 78715-1677
(512) 293-1556 phone
(512) 852-4506 fax
ketan@kharodlawfirm.com

AHDOOT & WOLFSON, PC
Robert Ahdoot
1016 Palm Ave.
West Hollywood, California 90069
Tel. (310) 474-9111
Fax (310) 474-8585
rahdoot@ahdootwolfson.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed a true and correct copy of the above document with the Clerk of the Court in accordance with the Court's Rules on Electronic Service, which caused notification of filing to be sent to all counsel of record.

This 10th day of August 2016.

/s/Jasper D. Ward IV
Jasper D. Ward IV
*Counsel for Plaintiff*